ANDREW MAST (CSBN 284070)
GABRIEL MARTINEZ (CSBN 275142)
MICHAEL RABKIN (ILRN 6293597)
ALBERT B. SAMBAT (CSBN 236472)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
gabriel.martinez2@usdoj.gov
Telephone: (415) 934-5300

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DANIEL ROSENBLEDT,<br><br>Defendant. | CASE NO. CR 13-00587 CRB<br><br>**UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. §5K1.1** |

  The United States respectfully requests that this Court sentence defendant DANIEL ROSENBLEDT to (1) serve fourteen months of custody, (2) serve three years of supervised release, and (3) pay a criminal fine of $10,000, a $200 special assessment, and $127,808 in restitution. This sentencing recommendation is based on the government's motion for a downward departure of 40 percent from the low end of the Guidelines range for substantial assistance and is consistent with the parties' plea agreement.

//

//

U.S.' SENT'G MEMO             1
*United States v. Rosenbledt*, CR 13-00587 CRB

# BACKGROUND

Rosenbledt is charged with participating in the conspiracy in San Mateo from April 2008 through January 2011, and participating in the conspiracy in San Francisco from November 2009 through January 2011. Rosenbledt first attended foreclosure auctions in the 1980s and purchased between 10 and 20 foreclosed properties with Giraudo. During that time, Rosenbledt observed payoff agreements, but they were not common. Presentence Report (PSR) ¶ 15.

In 2008, Rosenbledt began attending the foreclosure auctions regularly. At this time, the number of properties sold at the auctions, the number of people attending the auctions, and the amount of payoff agreements increased. Giraudo taught Rosenbledt about the bid-rigging agreements at the auctions. For example, Rosenbledt learned from Giraudo that payoff agreements were to be made in cash and were due when the buyer received the deed in the mail, instead of at the time of the agreement. PSR ¶ 16.

At first, Rosenbledt worked primarily with Kevin Cullinane in purchasing properties. By the beginning of 2009, Rosenbledt and Cullinane began purchasing properties as a group with Giraudo, Grinsell, and Rezaian, thus becoming the "Big 5." As a member of the Big 5, Rosenbledt was involved in purchasing a substantial number of rigged properties. Rosenbledt himself frequently tracked these payoff agreements through handwritten ledgers. PSR ¶ 17.

On September 5, 2013, Daniel Rosenbledt was charged by information with two counts of bid rigging and two counts of conspiracy to commit mail fraud in San Mateo and San Francisco Counties. Dkt. 1. On November 5, 2013, Rosenbledt pleaded guilty and began cooperating with the government's investigation. Dkt. 11. On October 11, 2017, by stipulation defendant Rosenbledt withdrew from his original plea agreement and entered a new plea agreement to bid-rigging charges only. Dkt. 41.

Rosenbledt's plea agreement reflects his involvement in rigging 141 properties in San Francisco and San Mateo Counties and a volume of commerce of $26,915,817. The volume of commerce does not reflect the bid-rigging agreements that Rosenbledt participated in for which he received payoff money. Rosendbledt received more than $125,000 in payoff money for agreeing not to bid on 70 properties. PSR ¶ 18.

# ARGUMENT

## A. Sentencing Guidelines Calculations

### 1. Criminal History

In Paragraph 12 of the plea agreement, the parties agree that Rosenbledt's Criminal History Category is determined by the Court. Dkt. 41. The PSR calculates Rosenbledt's Criminal History Category as I, based on minimal criminal history. PSR ¶¶ 40-42.

### 2. Offense Level

The PSR calculates the total offense level as 17, consistent with the plea agreement. PSR ¶ 37. This calculation includes a one-level increase to the base offense level of 12 for conduct involving the submission of non-competitive bids, a four-level increase for a volume of commerce exceeding $10 million, a three-level increase for the defendant's role in the offense, and a downward reduction of three levels for acceptance of responsibility. PSR ¶¶ 27-37. U.S. Sentencing Guidelines Manual ("U.S.S.G.") §§2R1.1(b)(1), 2R1.1(b)(2)(A), 3B1.1(b), 3E1.1(a), and 3E1.1(b) (U.S. Sentencing Comm'n 2016).

Under the Sentencing Guidelines, an offense level of 17 and Criminal History Category of I results in a sentence ranging from twenty-four to thirty months of imprisonment.

### 3. Fine and Restitution

The PSR calculates a fine range of $269,158 to $1,345,791, consistent with the plea agreement. PSR ¶ 74; U.S.S.G. §2R1.1(c)(1) (fine range shall be from one to five percent of the volume of commerce, but not less than $20,000). In the plea agreement, the government agreed to recommend a fine between $10,000 and $100,000. Dkt. 41. The government recommends a $10,000 fine. This fine range was initially agreed to by the parties in the original plea agreement, based on the application of the fraud Guidelines, and was carried over to the revised plea agreement.

The government recommends restitution in the amount of $127,808, consistent with the plea agreement. Dkt. 41.

//

//

### B. Basis for Role in the Offense Adjustment

Pursuant to his plea agreement, Rosenbledt agrees that a three-level enhancement for his role in the offense is warranted. Dkt. 41, ¶ 8. Sentencing Guideline Section 3B1.1 provides that if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants," a three-level enhancement should be applied.

Here, the conspiracy plainly involved more than five participants: 23 have pleaded guilty. PSR ¶13. Moreover, Rosenbledt's role shows a manager/supervisor enhancement is necessary. First, Rosenbledt directed other conspirators. For example, Farag sometimes bid on behalf of Rosenbledt (or other Big 5 members) at the auctions. Additionally, as a member of the Big 5, Rosenbledt was involved in the rigging of a significant number of properties. Only Giraudo and Grinsell have higher volumes of commerce. PSR ¶ 18.

However, the four-level enhancement designated for an "organizer or leader of a criminal activity" is not warranted. Although Rosenbledt played a critical role in the conspiracy, as mentioned above, it was Giraudo who was known for being in control and organized payoff agreements with others not in the Big 5. PSR ¶ 18.

### C. Basis for Downward Departure for Substantial Assistance

Pursuant to Section 5K1.1 of the Guidelines, the government moves for a downward departure for substantial assistance to the investigation. The government recommends a 40 percent reduction from the low end of the Guidelines range of 24 months, resulting in a sentence of 14 months.

The timing, significance, nature, and extent of Rosenbledt's cooperation warrant a 40 percent reduction. Rosenbledt entered his plea agreement pre-indictment on November 5, 2013, and immediately began cooperating in the investigation. His plea may have influenced the decisions of defendants who pleaded after him to also plead guilty and accept responsibility.

Additionally, Rosenbledt provided four candid interviews with the FBI in which he explained his notes regarding certain bid-rigging agreements. During his interview, Rosenbledt provided corroborating information regarding the operation of the conspiracy, the conduct of other conspirators, and various bid-rigging agreements. Rosenbledt also made himself readily

available to the prosecution team in the event he would be needed for further information or potential testimony.

For these reasons, a 40 percent downward departure for substantial assistance to the investigation and prosecution of these cases is appropriate.

**D.     Sentencing Recommendation**

The government's recommendation of 14 months is reasonable and not greater than necessary in light of the factors articulated in 18 U.S.C. § 3553. The Court's sentence must reflect the seriousness of the offense, promote respect for the law, and afford adequate deterrence to future bid-rigging offenses and white-collar crime generally.

Given the magnitude of the financial harm caused by Rosenbledt's conduct, the government's recommendation, which includes a custodial term, is appropriate and consistent with the commentary in the applicable Guidelines. The commentary makes clear that "prison terms for [Antitrust] offenders should be . . . common" and "alternatives such as community confinement [should] not be used to avoid imprisonment of antitrust offenders." U.S.S.G. §2R1.1, cmt. n. 5 & Background. Given Rosenbledt's substantial assets, a fine alone—in the absence of a custodial term—would not serve as a just punishment.

Also relevant to the seriousness of Rosenbledt's offense is the scale of his participation. Rosenbledt participated in rigging approximately 141 auctions, which is far more than most other participants in the conspiracy. The total bid-rigging payoffs on those properties where Rosenbledt suppressed competition was over $1 million—money that was divvied up as the fruits of the conspiracy rather than paid to the rightful beneficiaries. This conduct was especially harmful given its opportunistic timing during the foreclosure crisis in the late 2000s, when the integrity of the financial system was in jeopardy and required governmental intervention. It bred distrust in the auction process and discouraged investors outside of the conspiracy from attending the auctions to purchase foreclosed properties in what is typically a high-demand real estate market. Finally, Rosenbledt, as a member of the Big 5, carried out his crime on over a hundred occasions at or near the steps of various county courthouses, sometimes when law enforcement

//

was nearby. The government urges the Court to consider the brazen nature of this criminal conduct in imposing an appropriate sentence.

The proposed sentence also takes into account the need for deterrence. The Sentencing Reform Act notes that for white-collar crimes, "the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance." S. Rep. No. 98-225, at 91-92 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3274-75. This is especially true for antirust crimes, which are often hard to detect, taking place in the context of conspiracies that leave few physical clues. In this case, the investigation into the corruption at the foreclosure auctions took years to piece together. The potential for evading law enforcement and the resources required to investigate and prosecute such a conspiracy increases the need for tangible penalties to serve as a deterrent; otherwise, the potential financial upside and low likelihood of getting caught makes engaging in this type of criminal conduct even more enticing. The pervasive nature of this conspiracy also increases the need for deterrence. Dozens of investors thoroughly corrupted the auctions in multiple counties for over two years, recruiting new members, intimidating newcomers, and assuming—as Rosenbledt likely did—that they would never be held accountable for rampant bid rigging. Sentences commensurate with the Guidelines —based on a conservative measure of the harm caused by this conduct—will send a clear message across the industry that bid rigging is unacceptable.

Probation recommends a dramatic variance from Rosenbledt's Guidelines calculations that would cut his term of incarceration down to just one third of the low end of the Guidelines range. As discussed above, a variance is not warranted, especially given the magnitude of the financial harm caused by Rosenbledt's conduct. Rosenbledt was a principal member of the conspiracy who participated in a high volume of rigged auctions. A 14-month sentence adequately reflects Rosenbledt's history and characteristics, including his decision to accept responsibility and his willingness to pay restitution and cooperate in the investigation, while also accounting for the seriousness of the offense and the need to provide adequate deterrence.

//

//

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant the government's motion for a downward departure of 40 percent from the low end of the Guidelines range for substantial assistance and sentence defendant Daniel Rosenbledt to (1) serve fourteen months of custody, (2) serve three years of supervised release, and (3) pay a criminal fine of $10,000, a $200 special assessment, and $127,808 in restitution.

Dated:  April 19, 2018                                              Respectfully submitted,


                                                                    /s/ GABRIEL MARTINEZ
                                                                    United States Department of Justice
                                                                    Antitrust Division